**Opinion filed February 5, 2026**



## In The

# Eleventh Court of Appeals

_____

## No. 11-24-00080-CR

_____

## MEGAN MARIE LANGE, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 161st District Court**
**Ector County, Texas**
**Trial Court Cause No. B-23-0069-CR**

## M E M O R A N D U M   O P I N I O N

A jury convicted Appellant, Megan Marie Lange, of the capital offense of murder of an individual under ten years of age (Count One); injury to a child, a first-degree felony (Count Two); and injury to a child by omission, a first-degree felony (Count Three). TEX. PENAL CODE ANN. §§ 19.03(a)(8), 22.04(a), (e) (West Supp. 2025). The State did not seek the death penalty. Thus, the trial court sentenced Appellant to life imprisonment in the Institutional Division of the Texas Department

of Criminal Justice without the possibility of parole on Count One. *See* PENAL § 12.31(a)(2) (West 2019); TEX. CODE CRIM. PROC. ANN. art. 37.071, § 1(a) (West Supp. 2025). For Counts Two and Three, the jury assessed Appellant's punishment at life imprisonment, and the trial court sentenced Appellant accordingly, ordering the sentences on each count to run concurrently.

In two issues, Appellant argues that the trial court abused its discretion in denying her motions for continuance and her motion to suppress the State's autopsy evidence. We affirm the trial court's judgments.

## I. *General Background*

The decedent-victim in this case is Appellant's eight-year-old son, A.C.; the second oldest child of Appellant's seven children. At trial, Angela Warden, a city dispatcher, testified that she received a call on November 5, 2022, concerning a medical emergency at Appellant's residence involving a young child, later identified as A.C. Nathan Tells, a paramedic with the Odessa Fire Department, was dispatched to the residence and arrived to find A.C. lying non-responsive on the living room floor. Appellant was present but no one was performing CPR on A.C. According to Tells, A.C.'s lips were "almost black," and his body was cold to the touch. Tells described A.C. as "extremely skinny."[1] "Throughout [A.C.'s] whole body" were bruises in different stages of healing, and he had a "decent sized knot" on the left side of his head. Paramedics initiated CPR, intubated A.C., and gave A.C. intravenous fluids but were unsuccessful in resuscitating A.C. A.C. was then transported to a nearby hospital, where he was declared deceased.

Dr. Luisa Florez, a forensic pathologist who performed A.C.'s autopsy, testified that A.C. weighed twenty-nine pounds at the time of his death—less than

---

[1]Several witnesses testified at trial to A.C.'s malnourished appearance on November 5. Joshua White, a paramedic with the Odessa Fire Department, compared A.C.'s arms to the size of his two-year-old daughter's arms.

2

half of what a child his age should weigh. Dr. Florez testified that A.C. was "extremely malnourished" and had bed sores, abrasions, contusions, and scars all over his body. According to Dr. Florez, A.C.'s body showed signs of "healed hemorrhage and fresh hemorrhage" seen "a lot in motor vehicle accidents or blunt impact trauma, someone being assaulted[, b]ut not in a normal child." Dr. Florez further testified that A.C.'s lower lip appeared infected, and his nose showed signs of a healed fracture. The observed injuries present and documented in the autopsy were absent from past medical records.

A.C.'s death was ruled to be a result of asphyxia caused by manual strangulation with parental negligence included as a contributor. Dr. Florez opined that food and proper hydration had been withheld from A.C. Dr. Florez testified that, of the more than seven thousand autopsies she has performed, "this one goes in the top two" worst cases of child abuse. Dr. Florez noted that, in reviewing A.C.'s medical records, A.C. had been diagnosed with type 1 diabetes in 2018 and had lost weight between 2020 and 2022, the two years preceding his death. Moreover, despite being hospitalized nearly "every four months" from 2018 to 2020, A.C. had not been seen by a doctor since 2020. On cross-examination, Dr. Florez explained that A.C. had been tested for genetic disorders, which had been ruled out as a possible cause of his death.

In a recorded interview with law enforcement prior to her arrest, Appellant claimed that A.C.'s injuries had all been self-inflicted. Appellant stated, "He would want to throw himself around because he wasn't getting what he wanted." Appellant said that some of the bruising may also have come from playing on the trampoline and riding his bike with his siblings. According to Appellant, on the morning of November 5, 2022, she bathed A.C. because he had urinated on himself overnight. After his bath, A.C. asked for ice cream. Appellant stated she briefly turned her back to A.C. to retrieve him hot cocoa and returned to find him nonresponsive on

3

the living room couch.  Appellant maintained that she had recently taken her children to the doctor's office, and that they were diagnosed with an upper respiratory infection,[2] but A.C. otherwise "didn't seem like something physically was wrong with him."

## II.  *Motions for Continuance*

In her first issue, Appellant argues that the trial court abused its discretion in denying her motions for continuance.

### A.  *Relevant Background*

By the trial court's September 29, 2023 order, the case was specially set for trial on February 26, 2024.  On February 8, 2024, Appellant filed the first of the two motions for continuance.   In her unsworn February 8, 2024 motion, Appellant alleged that the State had not provided in discovery several items, including: records and statements pertaining to the codefendant's mental competency (Appellant's significant other at the time of A.C.'s death); CAC reports and video recordings; law enforcement reports; expert witness written reports; and "statements, notes, or relevant information in the State's control pertaining to the State's conversation with a defense-retained expert."  The trial court specifically pointed out that the motion was not sworn to, contrary to Article 29.08 of the Texas Code of Criminal Procedure.  *See* CRIM. PROC. art. 29.08 (West 2006).  Although Appellant's trial counsel offered to swear to and resubmit the original motion, she did not do so.  The trial court denied the motion.

On the Friday before trial, February 23, 2024 at 3:51 p.m., Appellant filed a "Verified Renewed Motion to Continue Jury Trial."  In Appellant's February 23, 2024 motion, Appellant argued that the State had delayed in providing discovery to Appellant in violation of Article 39.14 of the Texas Code of Criminal Procedure,

---

[2]Appellant did not specify which children received medical care.

and absent a continuance, her rights under the Sixth Amendment would be violated as she would be "forced to go to trial before having an adequate amount of time to review [the] voluminous discovery, independently investigate the factual allegations contained within the discovery materials, retain necessary experts, prepare to confront State's witnesses, or adequately present a defense." *See* CRIM. PROC. art. 39.14; U.S. CONST. amend. VI.

Appellant further argued that the following evidence had been uploaded between February 1–13, 2024:

> Over 12,266 additional pages of Child Protective Services (CPS) records, reflecting a last printed date of January 6, 2023;

> 1,235 new pages of medical records pertaining to the decedent, which contained a letter of release to Investigator Lujan dated November 21, 2022;

> Multiple new lab reports including a 65 page case file and a 3 page lab report, both issued on March 13, 2023;

> Over 1,371 pages related to DNA testing (STRMIX Reports) and analysis dated March 27, 2023;

> A 52 page supplemental police report; and

> Over 1,000 pages of social media records with business records affidavits completed on January 13 and 20, 2023.

Appellant additionally argued that "just over a week before trial," the State had provided "approximately 200 audio and video files, multiple reports pertaining to the co-defendant's mental status, and hundreds of pages of jail communications, and cell phone downloads."

The morning of trial, Monday, February 26, 2024, the trial court held a hearing on Appellant's "verified renewed" motion for continuance. The trial court questioned the State regarding the delayed disclosures. The State maintained that it had provided Appellant with the CPS records and the decedent's medical records

5

"the moment" the records were obtained. The State asserted that it had turned over cell phone downloads the same day that they were received from law enforcement. It was unclear whether there was a delay in providing lab reports to Appellant. At the conclusion of the hearing, the trial court denied Appellant's February 23, 2024 motion for continuance and notified the parties that "if information is offered relating to those records" at trial, the court would "review whether or not they should be admitted or not, based on timely discovery."

During trial, there were no objections predicated on the State's delayed discovery disclosures, and at no point did Appellant re-urge her motion for continuance. In her motion for new trial, Appellant's trial counsel asserted claims of juror misconduct, insufficient evidence, and judicial bias.[3] There was no argument or evidence introduced establishing that trial counsel's performance or her ability to present a defense was compromised by the trial court's denial of her requested continuances.

B. *Standard of Review and Applicable Law*

We review a trial court's denial of a motion for continuance for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007) (citing *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996)); *Stone v. State*, No. 11-21-00035-CR, 2023 WL 6321825, at *3 (Tex. App.—Eastland Sept. 29, 2023, no pet.) (mem. op., not designated for publication). The trial court has broad discretion in ruling on a motion for continuance. *Gonzales v. State*, 304 S.W.3d 838, 843–44 (Tex. Crim. App. 2010); *Gallo*, 239 S.W.3d at 764; *see* CRIM. PROC. arts. 29.06(6), 29.07. "In reviewing the trial court's ruling, we bear in mind the general interest in the fair and efficient administration of justice." *Brooks v. State*,

---

[3]After sentencing, Appellant filed a pro se motion for new trial before her trial counsel filed this motion. Appellant did not argue in her pro se motion that she was prejudiced by the trial court's denial of her motions for continuance nor by any delayed production of evidence introduced at trial. Appellant thereafter filed a motion to withdraw her motion for new trial.

No. 11-22-00339-CR, 2024 WL 1200481, at *2 (Tex. App.—Eastland Mar. 21, 2024, pet. ref'd) (mem. op., not designated for publication) (citing *Rosales v. State*, 841 S.W.2d 368, 375 (Tex. Crim. App. 1992)). "We also look to the particular facts of the case and consider the 'circumstances present in every case, particularly the reasons presented to the trial [court] at the time the request is denied.'" *Id.* (quoting *Rosales*, 841 S.W.2d at 374–75). To establish reversible error based on the denial of a pretrial motion for continuance, "a defendant must demonstrate both that the trial court erred in denying the motion and that the lack of a continuance harmed [her]." *Gonzales*, 304 S.W.3d at 843 ("Establishing harm, however, while necessary, is not a sufficient prerequisite to obtaining appellate relief. A defendant must preliminarily demonstrate that the trial court erred to deny the pretrial continuance in the first place.").

A request for a trial delay is based on nonstatutory and therefore equitable grounds. *Id.* at 844 n.11. But it is not enough that the defendant show diligence; the defendant must show that "the case made for delay was so convincing that no reasonable trial judge could conclude that scheduling and other considerations as well as fairness to the State" outweighs their interest in the delay of trial. *Id.* at 843 (quoting George E. Dix & Robert O. Dawson, 42 *Texas Practice Series: Criminal Practice & Procedure* § 28.56 (2d ed. 2001)); *Brooks*, 2024 WL 1200481, at *3.

Additionally, a defendant must demonstrate that they were actually harmed by the trial court's denial of his/her request for a continuance. *Gonzales*, 304 S.W.3d at 842–43; *see Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006) ("A defendant must show 'specific prejudice to his defense' to establish that the trial court abused its discretion in refusing to grant a continuance." (quoting *Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex. Crim. App. 1995))). "Ordinarily, a defendant can make such a showing only at a hearing on a motion for new trial because only then will he be able to produce evidence regarding what additional information, evidence,

7

or witnesses would have been available to him if the trial court had granted the motion." *Brooks*, 2024 WL 1200481, at *3 n.2; *see Gonzales*, 304 S.W.3d at 842–43 (noting that a showing of harm "can ordinarily be made only at a hearing on a motion for new trial, because almost always only at that time will the defendant be able to produce evidence as to what additional information, evidence[,] or witnesses the defense would have had available if the motion for delay had been granted" (quoting Dix & Dawson, *supra*)); *see also Rodriguez v. State*, No. 02-23-00224-CR, 2024 WL 1451974, at *2–3 (Tex. App.—Fort Worth Apr. 4, 2024, no pet.) (mem. op., not designated for publication) (noting that specific harm can ordinarily only be shown at a hearing on a motion for new trial and that, although the appellant filed a motion for new trial, his sole argument was that "the verdict [was] contrary to the law and evidence").

C. *Analysis*

We address each challenged motion for continuance in turn.

1. *February 8, 2024 Motion for Continuance*

With respect to Appellant's February 8, 2024 motion for continuance, Appellant failed to preserve error because her written motion for continuance was not sworn. *See* CRIM. PROC. art. 29.08 ("All motions for continuance must be sworn to by a person having personal knowledge of the facts relied on for the continuance."); *Parker v. State*, No. AP-77,110, 2025 WL 3127402, at *13–14 (Tex. Crim. App. Nov. 6, 2025); *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009) ( The appellant forfeited his appellate challenge to the trial court's denial of his unsworn oral motion for continuance by his failure to comply with procedures requiring the motion to be sworn to and in writing.). Appellant filed an unsworn motion for continuance, which the trial court orally denied. Accordingly, Appellant did not preserve for our review her complaint about the denial of her first motion for

continuance.  *See Parker*, 2025 WL 3127402, at *13–14; *Anderson*, 301 S.W.3d at 280–81.

## 2.  *February 23, 2024 Motion for Continuance*

Regarding Appellant's February 23, 2024 motion, for reasons explained below, we conclude the trial court did not abuse its discretion in denying the motion with an expression of willingness to revisit the issue during trial.

As stated above, Appellant must satisfy the two-prong test to show that the trial court committed reversible error by denying her pretrial motion for continuance. *Brooks*, 2024 WL 1200481, at *3.  Appellant filed her motion for continuance based on allegations that the State had delayed in providing discovery in violation of her constitutional and statutory rights, and as consequence, she needed additional time to prepare for trial.

On its face, this last-minute production of voluminous discovery appears egregious.  If this is the norm, it is not a practice that we would condone.  Appellant argues that "[t]he State's Discovery practices are a clear violation of Article 39.14 and frustrate the underpinnings of *Brady* and necessitate a continuance."

As the Court of Criminal Appeals recently reiterated in *State v. Heath*, 696 S.W.3d 677, 683 (Tex. Crim. App. 2024), Article 39.14(a) and (h) create a duty for the State to timely provide discovery to the defense.  Article 39.14(a) requires the State to produce discoverable items in the possession of law enforcement "as soon as practicable" after the State's receipt of a timely request for discovery.  *Heath*, 696 S.W.3d at 683 (citing CRIM. PROC. art. 39.14(a)).  "Article 39.14(h) creates an automatic duty for the [S]tate to disclose exculpatory, impeaching, or mitigating evidence that exists even if the defendant does not specifically request disclosure of such evidence."  *Id.* at 683 n.1 (citing CRIM. PROC. art. 39.14(h)).

Thus, "it is no longer sufficient for the State to wait until it gets ready, or when the prosecutor decides to prepare the case for trial, to then search out and produce

9

properly requested discovery." *Id.* at 707 (quoting *Heath v. State*, 642 S.W.3d 591, 597 (Tex. App.—Waco 2022), *aff'd*, 696 S.W.3d 677). "Article 39.14(a) now contains a timeliness requirement[,] and a prosecutor may inadvertently violate the statute by failing to exercise reasonable diligence in seeking out discoverable items" from law enforcement. *Id.* Indeed, the State should recognize that discoverable information in the possession of law enforcement is deemed to be in the possession of the State the moment that law enforcement acquires it.

Here, the State's failure to timely produce discovery may well have merited the granting of a continuance of the trial date, or the exclusion of such evidence if offered by the State at trial. But a trial court has broad "inherent authority to fashion an appropriate remedy for a discovery violation [that] is not limited to constitutional or ethical violations or bad faith defiance of a court order." *Id.* One appropriate remedy for an untimely disclosure, which Appellant was denied in this case, is a continuance to allow defense counsel more time to review the recently disclosed evidence.

As the court in *Heath* explained:

We acknowledge that a continuance would be a much more restrained solution. But that's not the question before us. The question before us is whether the trial court had the authority to impose the remedy it did. That the trial court could have imposed a lesser [or greater] remedy, assuming the formal requirements for a continuance were met, does not mean the trial court abused its discretion . . . in this case. It may very well be that reasonable jurists could disagree about the appropriate remedy in a particular case, but unless the trial court's decision is outside of the zone of reasonable disagreement, this Court will not overturn its ruling. . . . [T]he trial court was within its discretion to fashion a remedy it deemed appropriate.

*Id.* at 707–08.

As we have said, based on the State's actions, the trial court could have properly granted Appellant's motion for continuance or even precluded the State

from presenting such evidence at trial. *See id.* at 708 ("[T]he [S]tate's failure to ascertain the evidence it intended to introduce at trial in a timely fashion was enough of a showing of willfulness to justify [a] trial court's remedy . . . even if it did not rise to the level of a constitutional or ethical violation."). While continuance or even exclusion of the evidence were "not the only remed[ies] available to the trial court," they were not remedies, under the appropriate circumstances "beyond the trial court's discretion to impose." *Id.* In fashioning a remedy, fairness is required, but it is also important to convey that such behavior is not approved by the trial court and to ensure that any delay tactics or gamesmanship in the future is not inadvertently encouraged, rather, it is deterred.

Nevertheless, here, Appellant fails to demonstrate actual prejudice to her defense as a result of the trial court's denial of her motion—the second prong—because she did not identify or articulate any reasons as to how she was harmed by this denial. Appellant made no objection of actual prejudice or motion to exclude due to the alleged delay in discovery at the time that the evidence was offered for admission during trial. Appellant did not present any testimony or other evidence to show (1) which witnesses or discovery materials she would have otherwise presented at trial, (2) how she was harmed by the lack of unspecified evidence, (3) whether and how Appellant would have changed her trial strategy, or (4) whether this consequence affected her desire to testify or not testify at trial. *See Gonzales*, 304 S.W.3d at 842–43; *Brooks*, 2024 WL 1200481, at *4. Texas courts have routinely held that an appellant's bare assertion that she did not have adequate time to prepare for trial or the mere speculation of potential prejudice, such as the argument advanced by Appellant here, is insufficient to show harm. *Brooks*, 2024 WL 1200481, at *5 (collecting cases). Thus, Appellant's broad assertion on appeal that she was prejudiced is not enough to establish that the trial court abused its discretion. *See Renteria*, 206 S.W.3d at 699, 702 ("Case-law requires more than this

11

type of speculation to justify an appellate reversal of a case for a trial court's failure to grant a continuance."); *Guerrero v. State*, 528 S.W.3d 796, 800 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) ("[M]ere speculation about evidence that a defendant might have developed if the continuance were granted is not sufficient to demonstrate harm."). The absence of any showing of harm is fatal to Appellant's complaints on direct appeal.

We additionally observe that here, as the State notes in its brief, much of the discovery Appellant cited as a basis for her request for continuance was not offered as evidence at her trial. For what was admitted—for instance, medical records—Appellant made no objection. Appellant was also permitted to recall any State's witness as necessary and did so. She also did not file a motion for new trial or seek a postjudgment hearing on the basis that she was prejudiced by the trial court's failure to grant her a continuance. *See Cordova-Lopez v. State*, 680 S.W.3d 5, 12–14 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd) (concluding record did not support defendant's claim that he was harmed by trial court's denial of his motion for continuance where defendant "did not file a motion for new trial or seek to obtain a post-judgment hearing to produce evidence regarding any actual harm he suffered during trial because of the denial," and his argument was based solely on "[s]peculation"); *Brooks*, 2024 WL 1200481, at *3 n.2 (same). As the Texas Court of Criminal Appeals explained in *Gonzales*, a defendant can ordinarily only demonstrate the necessary showing of harm at a hearing on a motion for new trial, where evidence can be produced regarding what additional information, evidence, or witnesses the defense would have utilized had the trial court granted the motion for continuance. *Gonzales*, 304 S.W.3d at 842–43.

However problematic the State's delay was in producing evidence in this case, on this record, Appellant has failed to show that the trial court abused its discretion or demonstrate with considerable specificity *how* she was harmed by the trial court's

12

denial of her motion for continuance. *See Forrest v. State*, No. 11-21-00062-CR, 2023 WL 2316363, at *7–8 (Tex. App.—Eastland Mar. 2, 2023, pet. ref'd) (mem. op., not designated for publication) (An appellant must establish "with considerable specificity how [he] was harmed by the absence of more preparation time than he actually had." (alteration in original) (quoting *Gonzales*, 304 S.W.3d at 842–43)); *Garcia v. State*, No. 11-16-00187-CR, 2018 WL 3384574, at *2 (Tex. App.— Eastland July 12, 2018, no pet.) (mem. op., not designated for publication). Because Appellant did not demonstrate that she was harmed, it is unnecessary for us to consider the first prong, as failure to meet *both* parts of the test would preclude this court from finding reversible error on the part of the trial court. *See* TEX. R. APP. P. 47.1; *Gonzales*, 304 S.W.3d at 843; *Jackson v. State*, No. 11-21-00263-CR, 2023 WL 3633641, at *2 (Tex. App.—Eastland May 25, 2023, no pet.) (mem. op., not designated for publication).

For these reasons, Appellant's arguments that the denial of her motion for continuance was in violation of her Sixth Amendment right to counsel and related Article 39.14[4] complaint also fail. *See* CRIM. PROC. art. 39.14(a), (h). As noted above, Appellant does not state what evidence she would have sought to admit or exclude had she had more time to review discovery (i.e., what harm befell her) nor does Appellant now assert her counsel was ineffective, and the record shows Appellant's counsel provided vigorous representation for her at trial. Therefore, the record does not support Appellant's additional contentions. *See Villasana v. State*, No. 05-20-00950-CR, 2022 WL 3024325, at *1 (Tex. App.—Dallas July 29, 2022, pet. ref'd) (mem. op., not designated for publication) (adopting the standard for reviewing a denial of a motion for continuance in its analysis of the appellant's

---

[4]Appellant provides little discussion of Article 39.14, other than to claim the State's delayed production of various records was untimely and prejudiced her by leaving her no opportunity to review the information.

subsumed argument that the trial court's denial of his motion for continuance violated his Sixth Amendment right to counsel); *see, e.g.*, *Tulk v. State*, No. 02-24-00432-CR, 2025 WL 2088266, at *4 (Tex. App.—Fort Worth July 24, 2025, no pet.) (mem. op., not designated for publication) (concluding trial court did not abuse its discretion in denying appellant's motion for continuance based on an Article 39.14 complaint because even if it had been preserved, he had not shown he was harmed); *Cooper v. State*, No. 02-15-00286-CR, 2016 WL 6123640, at *2 (Tex. App.—Fort Worth Oct. 20, 2016, pet. ref'd) (mem. op., not designated for publication) (concluding trial court did not abuse its discretion in denying appellant's motion for continuance based on unavailability of trial counsel and noting that the appellate court "cannot glean from the record how the trial would have been different had lead counsel completed the trial or what deficiency co-counsel exhibited").

We overrule Appellant's first issue.

### III. *Motion to Suppress*

In her second issue, Appellant argues that the trial court should have suppressed any evidence related to the State's autopsy and erred in failing to do so. Appellant's motion to suppress was predicated on the State's failure to indefinitely preserve the decedent's body, which she maintains violated her due process rights to have the body examined by an expert of her choosing.

### A. *Relevant Background*

An autopsy was conducted on November 8, 2022. On December 7, 2022, the trial court issued an order preserving A.C.'s body for further analysis. Eight months later, on August 2, 2023, the State filed a motion to release A.C.'s body. The motion read, in relevant part:

> Since [November 8, 2022], the body of the victim has been held at Acres West Funeral & Crematory in refrigeration. The District Attorney is requesting the Court to allow burial of this child. The

Defense has had sufficient time to determine if a second autopsy was needed and they have not made a request.

At a hearing on the State's motion on August 15, 2023, Appellant notified the trial court that she was still attempting to verify if a second autopsy was, in fact, necessary. The trial court granted the State's motion at the conclusion of the hearing but ordered the delayed release of the body for twenty-one days to give Appellant an opportunity to inform the court whether a second autopsy would be necessary.

On September 1, 2023, Appellant submitted two filings: (1) a motion to preserve A.C.'s body and prohibit the release, and (2) a document titled "Ex Parte and Sealed Notice of Intent to Request Funding for a Second Autopsy." The notice of intent included a declaration by pediatric forensic pathologist Dr. Janice Ophoven, who broadly opined that "a second autopsy in this case is necessary and would provide relevant, and potentially exculpatory, information" to "adequately determine the correct manner and cause of death." Dr. Ophoven based her opinion on "the decedent's complicated medical history as well as findings in the initial autopsy report including, but not limited to, the lack of trauma to the trachea and airway." Dr. Ophoven stated that she was, however, "unable to complete the autopsy [her]self" due to "other previous engagements."

Also included as an exhibit was a signed declaration by the deputy director and head of mitigation at the Texas Defender Service, who stated that Appellant had reached out to a forensic pathologist and was awaiting a reply regarding his availability to perform a second autopsy. No motion for the appointment of a forensic pathologist to perform a second autopsy ever followed.[5]

---

[5]The trial court appointed an attorney from the West Texas Regional Public Defender's Office for Capital Cases on November 22, 2022, based on Appellant's representation that she was "without means to employ counsel of [her] own choosing." Forty-one days later, Appellant retained her own trial attorney and on January 2, 2023, filed a motion to substitute counsel. Appellant's retained attorney filed motions with accompanying orders for funding to retain an investigator and a mitigation expert. The attorney

On September 5, 2023, the court signed an order denying Appellant's motion to preserve the body. Two days later, Appellant filed an emergency motion for stay of the trial court's release order. On September 15, Appellant filed a petition for writ of mandamus, which was later dismissed upon her request because the body had been cremated a week before she filed the petition in this court. *See In re Lange*, No. 11-23-00210-CR, 2023 WL 6321791, at *1 (Tex. App.—Eastland Sept. 29, 2023, orig. proceeding).

During trial, immediately before the State introduced evidence related to A.C.'s autopsy—the testimony of Dr. Florez—Appellant re-urged her motion to suppress, arguing that the motion was "based on the fact that the body was disposed of," reiterating the evidence she "presented . . . ex parte" in support. The trial court denied Appellant's motion "[b]ased on the evidence that [the trial court] received at that time, and the fact that there is no additional evidence," but stated that it would allow her to re-urge the motion during trial. She did not do so.

B. *Standard of Review and Applicable Law*

"In reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review that gives almost total deference to the trial court's determination of historical facts that the record supports and consider *de novo* the application of the law to the facts." *State v. Heath*, 696 S.W.3d 677, 688 (Tex. Crim. App. 2024); *Baiza v. State*, 487 S.W.3d 338, 342 (Tex. App.—Eastland 2016, pet. ref'd). We will affirm the trial court's ruling on a motion to suppress if it is supported by the record and correct under any applicable theory of law. *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023). When, as here, "the trial court does not file findings of fact concerning its ruling on a motion to suppress, we assume that the court made implicit findings that support its ruling, provided that

explained that she anticipated that the mitigation specialist would "help [her] identify somebody who can give [her] an opinion" from "a database of experts."

those implied findings are supported by the record." *Ex Parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013) (citing *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005)); *Swanger v. State*, No. 11-23-00183-CR, 2024 WL 3817325, at *2 (Tex. App.—Eastland Aug. 15, 2024, no pet.) (mem. op., not designated for publication).

When addressing an allegation concerning the State's failure to preserve evidence in a criminal trial, "there is a distinction between 'material exculpatory evidence' and 'potentially useful evidence.'" *Garcia v. State*, 592 S.W.3d 590, 601 (Tex. App.—Eastland 2019, no pet.) (first quoting *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988); and then quoting *Ex parte Napper*, 322 S.W.3d 202, 229–31 (Tex. Crim. App. 2010)). "If the State withholds material exculpatory evidence still in its possession, a federal due process violation occurs regardless of whether the State acted in bad faith." *Id.* (citing *Illinois v. Fisher*, 540 U.S. 544, 547 (2004)). "Thus, a *Brady* claim requires proof that the sought-after evidence was both material and favorable to the defendant such that there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different." *Id.* (citing *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011)).

"[In] contrast, to prove a federal due process violation based on [the S]tate's destruction of merely 'potentially useful evidence,' a defendant must show that the State acted in bad faith in destroying the evidence." *Id.* (quoting *Fisher*, 540 U.S. at 547–48); *Youngblood*, 488 U.S. at 57–58; *see Payne v. State*, No. 11-19-00298-CR, 2021 WL 4998788, at *6 (Tex. App.—Eastland Oct. 28, 2021, pet. ref'd) (mem. op., not designated for publication) ("Misjudgment is not bad faith."). Potentially useful evidence is defined in *Youngblood* as "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." 488 U.S. at 57.

17

C. *Analysis*

Appellant argues that the State was required to preserve the decedent's body for an indeterminate time, and the State's failure to do so in this case was a violation of her constitutional due process rights.

### 1. *Supporting Authority*

In support of her argument, Appellant cites to *Rey v. State*, which concerns the trial court's denial of an *Ake*[6] motion for the appointment of a specific independent forensic pathologist. *See Rey v. State*, 897 S.W.2d 333, 335 (Tex. Crim. App. 1995). No such motion was filed here as to any specific expert or expertise that related to the autopsy and therefore, the analysis in *Rey* has little bearing on the issues before us. *See id.*; *cf. Griffith v. State*, 983 S.W.2d 282, 286–87 (Tex. Crim. App. 1998) (trial court was not outside of the zone of reasonable disagreement in refusing to appoint expert upon appellant's *Ake* motion, because appellant did not make a sufficient threshold showing for the need for expert's assistance, and it was "not entirely clear exactly what type of expert appellant was seeking"). Because Appellant did not file an *Ake* motion for a forensic pathologist or other specific expert,[7] *Rey* is inapposite. *See Ex parte Jimenez*, 364 S.W.3d 866, 881–82 (Tex. Crim. App. 2012) (requiring the defendant to make, in a written motion presented to the trial judge, "a pretrial 'preliminary showing' that is based upon more 'than undeveloped assertions that the requested assistance would be beneficial'" (quoting *Williams v. State*, 958 S.W.2d 186, 192 (Tex. Crim. App. 1997))).

---

[6]*Ake v. Oklahoma*, 470 U.S. 68 (1985).

[7]Instead, Appellant vaguely represented to the trial court, over time, that Appellant was still attempting to verify if a second autopsy was, in fact, necessary; that Appellant was awaiting a reply regarding availability to perform a second autopsy; and that she was anticipating that a mitigation specialist would assist in identifying an individual who could give an opinion from a database of experts.

Appellant also cites to Article 39.14(a) of the Texas Code of Criminal Procedure, which provides, in relevant part:

> [T]he [S]tate shall produce and permit the inspection and the electronic duplication, copying, and photographing, by or on behalf of the defendant, of any offense reports, any designated documents, papers, written or recorded statements of the defendant or a witness, including witness statements of law enforcement officers but not including the work product of counsel for the state in the case and their investigators and their notes or report, or any designated books, accounts, letters, photographs, or objects or other tangible things not otherwise privileged that constitute or contain evidence material to any matter involved in the action and that are in the possession, custody, or control of the state or any person under contract with the state.

CRIM. PROC. art. 39.14(a).

Whether human remains come within the ambit of Article 39.14 is a question which has not yet been addressed in Texas, but at least three out-of-state courts have been reluctant to interpret their respective discovery statutes as imposing a duty on the prosecution to indefinitely preserve human remains. *See State v. Henry*, 875 N.W.2d 374, 392, 394–95 (Neb. 2016) (concluding its testing-and-analysis-of-evidence statute did not apply to human remains because unlike other tangible physical evidence, "a person's body is uniquely connected to the emotional feelings of the deceased's relatives, who wish to dispose of their loved one's remains as they see fit, rather than preserve them for duplicative tests or analysis" and considerations are at play which are not present with "ballistics, firearms identification, fingerprints, blood, semen, or other stains"); *State v. Shaffer*, 725 P.2d 1301, 1306–07 (Utah 1986) ("[H]ere the 'tangible object' is the body of a homicide victim, the State is not required to keep the body for an indeterminate amount of time. A concern for human decency and preventing the spread of disease requires that unclaimed bodies be buried." (citing U.C.A., 1953, § 26–4–25 (1984)); *People v. McNeill*, 112 Cal. App. 3d 330, 337–38 (Cal. Ct. App. 1980) ("[P]rosecutorial agencies have no right to

19

custody of the remains of a deceased; therefore no duty of preservation arises. . . . Although a 'trial court has the discretion to allow discovery by a criminal defendant including the examination of a body in some circumstances,' a court will not judicially legislate to require 'a coroner retain possession of a body until a defendant requests permission to conduct his own autopsy examination. Due process does not compel such a ruling.'" (quoting *People v. Vick*, 11 Cal. App. 3d 1058, 1066 (Cal. Ct. App. 1970))).

In a civil case, we have previously acknowledged that the next of kin have a common law right to direct the disposition of the deceased's remains, and there exists a statutory right to make the arrangements for disposition of the decedent's remains. *See Nelson v. SCI Tex. Funeral Servs., Inc.*, 484 S.W.3d 248, 255–56 (Tex. App.—Eastland 2016), *aff'd*, 540 S.W.3d 539, 548 (Tex. 2018) (discussing the appellant's quasi-property right under common law and his statutory right pursuant to Section 711.002 of the Texas Health and Safety Code). However, we have never discussed the interplay between this statutory right and a defendant's statutory right to discovery; we need not decide this question today. Apart from a single citation by Appellant, the crux of Appellant's argument is one of due process, and thus, our inquiry turns on whether this sought after evidence was "both material and favorable to the defendant such that there is a reasonable probability" that had A.C.'s body remained available to Appellant, "the outcome of the trial would have been different." *See Garcia*, 592 S.W.3d at 601. Appellant has provided us with no authority concerning a similar fact pattern, nor have we found any within this State. Nevertheless, we are guided by the principles set forth in *Youngblood* and its progeny.

### 2. *Materiality*

Appellant argues that the victim's body was material exculpatory evidence and "a second autopsy was necessary to determine the correct cause of death

20

because, based on the State's autopsy report, the decedent's body did not show trauma to the trachea and airway." To be clear, Appellant acknowledges that the State's autopsy report already found an absence of trauma to the trachea and airway. But Appellant takes issue with the State's forensic pathology expert, Dr. Florez, whose conclusion was that strangulation was A.C.'s cause of death. In other words, Appellant argues that if A.C.'s body had been preserved there is a "reasonable probability" that the outcome of the trial would have been different. *See Pena*, 353 S.W.3d at 809; *Payne*, 2021 WL 4998788, at \*6.

It is significant that here, the State's indictment listed the *impeding of breathing and circulation* as one of *two* manners and means for two of the counts with which Appellant was charged: capital murder (Count One) and injury to a child (Count Two).[8] The other manner and means listed in the indictment was refusing to provide nutrition, hydration, or medical care, and striking him in the head, respectively. *See generally Sanchez v. State*, 376 S.W.3d 767, 774 (Tex. Crim. App. 2012) (providing that jury unanimity does not require that the jury agree on the manner and means; "[t]he jury need only unanimously agree that appellant caused the death of the complainant"). Importantly, there was significant evidence presented at trial regarding injury consistent with a refusal of care and from striking the head of the child. But Appellant does not address how the preservation of A.C.'s body would have yielded different results with respect to the alternative manner and means that the State alleged in its indictment.

The evidence showed that A.C. was an eight-year-old child who slept in a baby bouncer and had not been enrolled in school or seen by a medical professional in the two years preceding his death, despite having unmanaged diabetes that

---

[8]Count Three was injury to a child by omission, alleging that Appellant had failed to provide A.C. "adequate nutrition, hydration, or adequate medical care," and she "had a statutory or legal duty to act" as she was A.C.'s mother or had care, custody, or control of A.C.

21

previously required medical intervention every four months. Several witnesses testified to the existence of severe abrasions covering A.C.'s body and his malnourished appearance at the time of his death. One paramedic testified that he has a son, who skateboards and participates in Mixed Martial Arts but whose appearance was starkly different from A.C. as an eight-year-old:

> I will never forget how little he was for an eight year old. I will never forget the amount of bruises that he had on him. I will never -- I mean, those aren't things that we see every day at work. Like in my eleven years, at most, I have seen maybe ten kids that have been cardiac arrest. And this is the first kid that I have seen that has been just completely bruised up like that. And that is something that won't leave -- it is not going to leave my head.

Internally, A.C. had "changes in his intestine due to malnutrition" and abnormal lungs, which Dr. Florez opined was the result of untreated pneumonia. In addition to Dr. Florez's testimony regarding her autopsy findings, the photographs admitted at trial depict a severely underweight child covered in bruises, scars, and with a large head wound. Dr. Florez testified that though the immediate cause of death was strangulation, A.C.'s death was contributed to by infliction of injuries, neglect, malnutrition, withholding of health care, and withholding of food and hydration. There were no objections made as to Dr. Florez's qualifications at trial, and Appellant's trial counsel cross-examined Dr. Florez on other possible causes for his bruised and malnourished appearance.

From the State's autopsy, the evidence was preserved in the form of photographs and written reports and was subject to cross-examination and confrontation. Under these facts, Appellant has not shown that there is a reasonable probability that had A.C.'s body been preserved, exculpatory evidence would have been revealed so that the outcome of the trial would have been different. *See Garcia*, 592 S.W.3d at 601; *see also Shaffer*, 725 P.2d at 1306–07 (affirming the trial court's denial of the appellant's motion to suppress evidence of an autopsy and rejecting the

22

appellant's argument that the destruction of the victim's body denied him due process where the victim's body, having been examined and having been unclaimed for one and one-half months, was released and cremated before the appellant could perform an independent autopsy because "evidence was preserved in the form of photographs and written reports and was subject to cross-examination and confrontation," and the appellant had "not shown that such evidence was material to the issue of guilt or innocence"); *Henry*, 875 N.W.2d at 392, 394–96 (holding the same, in part, because the appellant "failed to explain how reanalysis of [the victim's] body could have led to a different determination" of the victim's cause of death); *see also State v. Quist*, 910 N.W.2d 900, 903–04 (S.D. 2018) (in a review of a trial court's denial of a motion to dismiss based on an argument that the State had violated the appellant's due process rights by failing to provide him notice that the decedent's body would be returned to the family and cremated, holding that "without a showing of the deprivation of exculpatory evidence, cremation of a decedent's remains is no basis for this type of speculative due-process-discovery claim").

Even if we were to conclude that, had A.C.'s body been preserved, evidence therefrom would have been "potentially useful" in Appellant's defense, a failure to preserve such "potentially useful evidence" would not violate due process without a showing of bad faith on the part of the State. *See Fisher*, 540 U.S. at 547–48. No allegation or evidence of bad faith is presented here.

### 3. *Potentially Useful*

Appellant insists that she is not inferring that the State *intentionally* destroyed the victim's body, rather, Appellant argues that her "trial counsel had filed numerous motions for the body not to be released, but those instructions were *inadvertently* ignored and the body was cremated." Appellant's characterization of the events omits the true context of the State's actions, and Appellant's omissions may imply

some possible wrongdoing in not preserving A.C.'s body indefinitely. *See Garcia*, 592 S.W.3d at 601.

At the time that the State requested that the trial court order the release of A.C.'s body, A.C.'s body had been at a funeral home for almost nine months, during which there was no pending challenge to the body's release. At the hearing on the State's motion, Appellant was still unsure of the necessity of an independent autopsy. Only after the hearing did Appellant submit a motion to renew the trial court's prior order preserving A.C.'s body, which the trial court denied. Even then, as we have said, no corresponding motion for the appointment of an expert (*Ake* motion) on autopsies, such as a forensic pathologist or a medical examiner, predated, accompanied, or followed her motion. *See Ex parte Briggs*, 187 S.W.3d 458, 463, 468 (Tex. Crim. App. 2005) (noting that an *Ake* motion was available for court-provided funds to pay an expert for a defendant with retained counsel if the defendant is otherwise indigent); *Banks v. State*, No. 11-18-00337-CR, 2020 WL 7863333, at *5 (Tex. App.—Eastland Dec. 31, 2020, pet. ref'd) (mem. op., not designated for publication).

Thus, any suggestion of bad faith on the part of the State would have to be based on (1) the mere filing of the motion for the trial court to release the body—made almost nine months after the child's death and the State's autopsy had been conducted; and (2) the State's failure to withdraw its motion for release of the body to the family even *after* the trial court issued its order allowing an additional twenty-one days to advise the court of an expert that will re-autopsy the body. The State did not merely destroy evidence, rather, it went through the judicial process to get a court order to release the body, which the funeral home then cremated. Thus, we decline to find bad faith under these facts. *See Ex parte Napper*, 322 S.W.3d at 234 (collecting cases where courts have found the State acted in bad faith in destroying evidence); *see, e.g., State v. Porter*, 948 P.2d 127, 136 (Idaho 1997) (concluding no

24

due process violation where the victim was cremated before the defense had been given an opportunity independently to examine the body because "there was no showing that cremation of the body actually prejudiced [the appellant], nor that the State authorized the cremation of the victim's body with a bad faith intent to destroy evidence"); *see generally Commonwealth v. Riccardi*, No. 824 MDA 2017, 2018 WL 2077848, at *6–7 (Pa. Super. Ct. May 4, 2018) (concluding the State's release of the victim's remains to family who then decided to have the remains cremated did not amount to bad faith by the State).  In sum, Appellant made no claim of bad faith and, upon our review of the record, we have found no evidence of bad faith on the part of the State.

Considering the foregoing, we conclude the trial court did not err in overruling Appellant's motion to suppress.  *See Fisher*, 540 U.S. at 547–48.  We overrule Appellant's second issue.

IV. *This Court's Ruling*

We affirm the judgments of the trial court.


W. BRUCE WILLIAMS

JUSTICE


February 5, 2026

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.